**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAXIM WORLD LIMITED,<br><br>    Plaintiff,<br><br>    v.<br><br>AVENDRA, LLC,<br><br>    Defendant. | Case No. 1:26-cv-4883<br><br><br>**COMPLAINT AND DEMAND**<br>**FOR A JURY TRIAL** |

Plaintiff Maxim World Limited ("Maxim World"), by and through its undersigned counsel, for its Complaint against Defendant Avendra, LLC ("Avendra"), alleges, upon personal knowledge and information and belief, as follows:

## NATURE OF THE CASE

1.      This action concerns a years-long deception by Avendra, one of the world's largest group purchasing organizations in the hospitality sector, against its own suppliers—including Maxim World.

2.      Maxim World supplies innovative and custom products to hospitality providers around the world. Puneet Bhalla, CEO of Maxim World, built the company from the ground up. Over the last 20 years, he grew the company from a startup to a respected hospitality supplier. Maxim World and its related companies generate approximately $46 million in revenue on an annual basis.

3.      Seeking to expand its operations to new markets, Maxim World began exploring available opportunities in the United States in 2017. Ultimately, Maxim World was convinced to

1

join Avendra's selective "Preferred Supplier" program based on false promises that Avendra would support Maxim World in scaling its U.S. business.

4.    Avendra, which is a group purchasing organization that specializes in the hospitality industry, was founded by five international hotel conglomerates and later purchased by Aramark. Its customers are hotels, golf clubs, spas, casinos, restaurants, and other related hospitality providers. It aims to amalgamate its customers' collective buying power to secure superior pricing, as well as to ease the burden of the procurement process for its customers.

5.    Avendra generates revenue by charging suppliers various fees, including administrative fees and rebates. In exchange, Avendra promises suppliers like Maxim World two supposed competitive advantages. As detailed below, neither has genuine value for suppliers; in fact, they are merely promotional theater.

6.    Avendra's promises were empty from the start. Avendra never intended to actively promote Maxim World to its customers. It does not drive new business to suppliers. And Avendra's purported sales efforts and supplier "Success Stories" are nothing more than marketing window dressing. Instead, Avendra passively enriches itself by collecting a percentage on sales that its suppliers could have made on their own.

7.    Believing Avendra's false statements about its promotional capabilities and efforts to be truthful, Maxim World decided to make Avendra the centerpiece of its U.S. growth strategy.

8.    While Maxim World began to suspect it had been deceived by late 2024, there was no way to confirm if that was the case. Maxim World remained in the Preferred Supplier program with the vain hope that its luck would turn and Avendra's promises would soon come to fruition.

2

9.      Avendra's scheme was inadvertently revealed in a July 15, 2025 email from Patrick Mayhew, Avendra's Vice President and Head of Strategic Sourcing. When Maxim World asked Avendra what it had done to promote Maxim World, Mayhew confessed that Avendra had done nothing more than post a cursory listing on Avendra's website and in its promotional materials.

10.      Maxim World brought Mayhew's email to Avendra's attention. In response, Avendra could not identify a single new purchase order it had generated. Instead, Avendra retreated to empty excuses ("Avendra does not direct, nor does it have any control over the purchasing decisions of its members.") and unjustified victim blaming ("Avendra has more than met its contractual obligations to promote Maxim, even under circumstances where Maxim's performance has been abysmal."). Avendra's inability to articulate any concrete promotional efforts confirms that it deceived Maxim World from the outset.

11.      Worse still, Avendra retaliated against Maxim World for what it perceived as insubordination. Avendra falsely disparaged Maxim World and destroyed its relationship with a leading hospitality chain (the "Hospitality Chain"). That chain is no longer purchasing from Maxim World—costing it millions of dollars annually.

12.      Maxim World brings this action to recover costs related to fees and rebates it has paid Avendra over the course of their relationship, damages for the lost business opportunities that Maxim World suffered due to Avendra's deceptive practices, and damages for the loss of a significant business relationship as the result of Avendra's unjustified disparagement.

## PARTIES

13.      Maxim World is a United Kingdom corporation with a principal place of business in the United Kingdom. Maxim World is a worldwide supplier of hospitality products,

specializing in the design and manufacture of products for hotels, restaurants, and similar businesses.

14.     Avendra is a Delaware limited liability company with a principal place of business located in Rockville, Maryland. Avendra is a centralized group purchasing organization that provides hospitality procurement services. Avendra's sole member is Aramark, Inc., which is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over Maxim World's claims pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity between Maxim World and Avendra, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     The Court also has subject matter jurisdiction over this action under Section 39 of the Trademark Act of 1946 (the "Lanham Act," 15 U.S.C. § 1121; 28 U.S.C. §§ 1331, 1338); and general principles of ancillary and pendent jurisdiction, 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendant subject to the forum-selection clause governing disputes arising out of the parties' "Supplier Agreement." *See* Avendra Supplier Agreement (the "Agreement") § 14 (Ex. A). This Court also has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k) and/or N.Y.C.P.L.R. §§ 301 & 302.

18.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(c)-(d) because pursuant to the Agreement, the parties agreed to bring any legal action exclusively in the "Courts of the State of New York" or the United States District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

### A.  Avendra's False Promises Convince Maxim World to Become a Preferred Supplier

19.    In 2017, Maxim World was looking to expand by growing its presence in the United States market.  Although Maxim World considered forming its own U.S. salesforce to organically grow the business, it decided to forego this strategy in favor of partnering with Avendra.

20.    Avendra was attractive because of its claimed ability to introduce Maxim World to new customers. For example, Avendra claimed on its then-existing website to offer consulting and procurement services to a large network of hospitality providers, which included advising providers about which "quality products [they] need now," as well as "help[ing] to determine what products [they] should be thinking about next quarter."

21.    Based on its purported relationships with hospitality providers, Avendra falsely represented that it could drive new business to companies that signed on to become a "Preferred Supplier." Avendra promoted its Preferred Supplier program by claiming it would serve as "[y]our channel for sales growth in the hospitality industry" and would "bring the market to you." Avendra claimed it could generate consistent sales growth because its "300+ associates ensure customers buy the right items from the right suppliers." These were misrepresentations designed to entice suppliers like Maxim World to become Preferred Suppliers.

22.    Further, Avendra emphasized the attractiveness of its Preferred Supplier program by populating its website and other promotional materials with "Supplier Success Stories." This was a collection of Preferred Suppliers who had supposedly enjoyed outstanding sales growth by partnering with Avendra.

23.    According to one such testimonial posted on its website, working with Avendra means "doors open easily for us." Another testimonial stated: "As part of the Avendra team, we are given the opportunity to present our expanded value proposition to engaged decision-makers for new business opportunities and scope expansions within existing print programs." In a different testimonial, Avendra bragged about how it had helped a regional fruits and nuts supplier enter the United States market and achieve "double digit sales growth" annually for more than a decade. Avendra credited its "representatives in the field," as well as "the company's great technology" for this consistent sales growth.

24.    What Maxim World could not know is that Avendra had no genuine ability to drive customers to Maxim World. Avendra's network of customers provides marginal utility to suppliers because none of Avendra's customer relationships are exclusive: suppliers can sell directly to the large hospitality providers on Avendra's platform by working through their procurement departments. Selling through Avendra is actually a negative for suppliers because Avendra takes a significant cut from every transaction, eating into already slim margins.

25.    Relying on Avendra's misrepresentations and omissions, Maxim World completed Avendra's Preferred Supplier application form. Avendra subsequently subjected Maxim World to a wide ranging "category review" supposedly for the purpose of analyzing its business history, record of customer service, and pricing. At the time, Avendra emphasized that its "category review" process was selective and that it contracted with "the fewest number of suppliers . . . to meet customer needs" so that it could "work to develop the business with those contracted suppliers."

26.     On information and belief, the genuine purpose of this review process was to deceive Maxim World and other suppliers by portraying Avendra's Preferred Supplier program as a selective club that would enjoy favored access to Avendra's customers.

27.     Following this review, the parties entered into a formal relationship. On February 21, 2018, Maxim World and Avendra executed a Supplier Agreement governing Maxim World's official designation as a "Preferred Supplier." Ex. A § 1. In the Agreement, Avendra committed to provide Maxim World the services described above and "designate [Maxim World] to perform certain manufacturing, warehousing, sale and/or supply" of goods for Avendra customers. Ex. A.

28.     The Agreement contained a number of requirements. For one, it obligated Avendra to "promote" Maxim World to its customers and distributors, including by "list[ing]" Maxim World in its "Client Information Portal" and "present[ing]" Maxim World "to the Clients." Ex. A §§ 1(a), (e). Second, Avendra committed to "building positive relationships" between Maxim World and Avendra's customers, who, in turn, are supposed to purchase the "preponderance of their requirements for goods and services" from Avendra's preferred suppliers. *Id.* § 1(b). In service of these relationships, Avendra also committed to make "every reasonable effort" to provide Maxim World "information relating to Avendra's Clients." *Id.* § 1(c).

29.     In return, Maxim World paid Avendra "Allowances" and rebates in accordance with the terms and conditions set forth in the Agreement. Ex. A § 4(b); *id.* at Exhibit D ("Allowances").

**B.  Maxim World Dutifully Attempts to Partner with Avendra**

30.     Subsequently, Maxim World performed in good faith based on Avendra's reassurance that it could deliver its promised services. Maxim World regularly pitched its

offerings to Avendra, submitted proposals for inclusion in purchase orders, and networked with Avendra's sales personnel.

31.    Between 2018 and 2025, Maxim World reached out to Avendra on numerous occasions in hopes of developing new business. For example, during this period, Maxim World regularly contacted Avendra to update Avendra on new product offerings. Many of these exchanges spanned days and weeks, requiring several Maxim World staff members to prepare quotes, inventory summaries, and, in several instances, mock-ups of certain products.

32.    Maxim World also made special efforts to convince Avendra of its capabilities. Maxim World committed over $175,000 to expedited and freight delivery services to prevent delays. Maxim World also tried to encourage Avendra's promotion in other ways, such as showing its operational capabilities through donation to Avendra's philanthropic efforts. In one instance, Avendra sought Maxim World's help to rapidly procure and deliver supplies for military appreciation packages. Maxim World immediately answered Avendra's call, offering free expedited delivery on supplies outside the scope of the parties' Agreement.

33.    Despite these sustained efforts, Avendra did not drive a single new client to Maxim World.

34.    Maxim World's outreaches resulted in either unfulfilled promises to revert about future opportunities or no answers at all. Nevertheless, Maxim World still believed that Avendra would drive new business to it. Avendra's size, its institutional association with Aramark, and Avendra's repeated reassurances convinced Maxim World to continue relying on Avendra to grow its U.S. business.

**C. Avendra Retaliates Against Maxim World for Attempting to Grow its Business Organically**

35.    Given Avendra's complete failure to generate new customers, Maxim World began pitching its services directly to U.S. hospitality providers. Avendra responded by disparaging Maxim World and ultimately succeeding in destroying its business relationships. Although Maxim World cannot yet know the full measure of Avendra's wrongdoing, what it has discovered is damning.

36.    In late 2024, Maxim World pitched the Hospitality Chain on expanding their relationships, resulting in a meeting between Bhalla and a senior official at the Hospitality Chain. This resulted in then-promising new opportunities, precisely the type of business opportunities that Maxim World would have developed on its own but for its reliance on Avendra's false promises.

37.    Word of the meeting between Bhalla and the Hospitality Chain soon reached Avendra. In or around September 5, 2024, Bhalla met with a high-ranking member of Avendra's sales team, Leonard Queiroz, who specifically communicated to Bhalla that Avendra would do "whatever it takes" to outcompete Maxim World for the Hospitality Chain's business.

38.    Soon after his September meeting with Queiroz, Bhalla learned that Avendra's President, Walt Sheffler, had disparaged Maxim World and shared confidential information during a meeting with several hospitality executives. A senior representative from the Hospitality Chain was in attendance. Although the gathering was intended to be casual, Sheffler produced a document purporting to show that Maxim World had failed to pay certain Avendra invoices. Sheffler's purpose was not merely to compete with Maxim World—it was to maliciously harm the company's reputation because it had dared to develop business on its own.

39. Avendra's mission to interfere with Maxim's growth only became clearer from there. On November 19, 2024, an Avendra employee contacted Maxim World out of the blue, seeking information about its European sales to the Hospitality Chain. When Bhalla complied, the Avendra employee inadvertently replied to Bhalla—instead of his own colleague—that he "figured as much," and that "[s]omething is off here." Bhalla sought clarification but received no response. This curious exchange demonstrates both Avendra's investigation into and displeasure with Maxim World's independent relationship with the Hospitality Chain.

40. During this same period, Avendra began pressuring Maxim World by raising unjustified complaints about its performance and making unnecessary demands for inventory information. Avendra also persistently demanded payments that had already been identified by Maxim World as erroneous charges because they involved direct customer sales outside of the Avendra platform.

41. Avendra did not stop there. Avendra placed Maxim World on a "Supplier Improvement Plan" (the "SIP") akin to a "Performance Improvement Plan" or "PIP" used for underperforming employees. Pursuant to the SIP, Avendra required Maxim World to provide a range of information and submit to a series of meetings.

42. To emphasize that this was a punishment, Avendra announced that "Maxim must improve its order fill rate, improve its communication and resolution of issues brought to its attention . . ., as well as make all contractually obligated payments to Avendra on time and in full in order for Maxim to be maintained as an Avendra program supplier and for Avendra to continue to promote Maxim to its clients."

10

43.     Moreover, Avendra included the Hospitality Chain in communications and meeting invites regarding the SIP, causing them to learn confidential details of Avendra and Maxim World's accounts payable disputes and Maxim World customer service matters.

44.     Avendra implicitly suggested it was including the Hospitality Chain in the SIP discussions because its purported concerns with Maxim World implicated them as well. However, most of Avendra's stated concerns had nothing to do with the Hospitality Chain. The reality is that Avendra intended to embarrass Maxim World and thereby punish it for working directly with the Hospitality Chain.

**D. Maxim World Uncovers Avendra's Misconduct**

45.     Alarmed by Avendra's aggressive move to place Maxim World on the SIP, Maxim World's Global Head of Legal Affairs, Rolf Oeldorf, sought an update on Avendra's promotional efforts on behalf of Maxim World.

46.     In a July 2, 2025 email to Avendra, Oeldorf requested "clarification on when and how Avendra promoted Maxim as a preferred supplier and what specific efforts were undertaken to encourage purchases from Maxim World since the Agreement came into effect. . ." Additionally, Oeldorf asked a straightforward question: "how many sales opportunities have been provided to Maxim World during this period?"

47.     Avendra initially ignored Oeldorf's outreach. However, after being pressed, a Patrick Mayhew responded with a startling confession: Avendra's promotional efforts to date, since the beginning of the parties' relationship, were limited to (i) listing Maxim World's products on its client portal and (ii) identifying Maxim World as a "supported" supplier in unspecified materials.

48.    As noted above, missing from Mayhew's response was any representation that Avendra had promoted Maxim World to its customers or attempted to facilitate relationships between Maxim World and hospitality providers. Tellingly, he mentioned none of Avendra's prior promises to drive sales growth or even influence customer decisions.

49.    When confronted with Mayhew's email, Avendra held the line and failed to identify even a single new business opportunity it had generated. As noted above, Avendra resumed a familiar pattern. It began by offering empty excuses for its failure to promote Maxim World, denying previous representations and stating that "Avendra does not direct, nor does it have any control over the purchasing decisions of its members."

**E.  Maxim World's Injuries and Losses**

50.    Maxim World has suffered three distinct and significant categories of injury due to Avendra's fraudulent conduct and unjustified disparagement.

51.    *First*, Maxim World has been injured through its payments of Allowances to Avendra over the course of the parties' nearly eight-year relationship. Maxim World made these payments to Avendra despite (i) Avendra's known inability to provide its advertised services and (ii) Avendra's attempts to share both false and confidential information with providers to dissuade them from working with Maxim World. To date, Maxim World estimates it has wrongfully paid Avendra Allowances in excess of $1.5 million.

52.    *Second*, Maxim World has suffered lost business development and growth opportunities caused by Avendra's deceit. The Supplier Agreement obligates Avendra to promote and sell Maxim World's products in an "Authorized Service Area" including, among other countries, the United States. Reasonably assuming that Avendra would abide by its promises, Maxim World lost nearly eight years of opportunity to develop its U.S. infrastructure. This

missed opportunity was based on Avendra's repeated assurances that it would direct Maxim World to customers in the Authorized Service Area.

53.    *Third*, Avendra's disparaging statements about Maxim World severely damaged Maxim World's over twenty-year relationship with the Hospitality Chain, eventually leading to a rupture in that relationship.

54.    On or around June 24, 2025, a Hospitality Chain representative informed Maxim World that "[u]ntil we see improvement I do not recommend we award an[y] new work to your company."

55.    At the end of 2025, the Hospitality Chain declined to extend its contract with Maxim World. Subsequently, Bhalla spoke with a representative of the Hospitality Chain to inquire why this had taken place, notwithstanding their long working relationship. Both during this conversation and in a follow up email correspondence, the representative pointed to concerns about Maxim World's "financial stability"—which is precisely what Avendra had contended was the basis for the SIP—as the reason the contract was not extended.

56.    Bhalla tried to address these concerns, explaining that "Maxim World is part of a bigger group of companies and we are a very stable group." But the damage from the unjustified SIP could not be undone. In a February 27, 2026 email, the Hospitality Chain's representative was unequivocal: "With respect to the future, we will not be renewing any agreement with you in any region which we operate hotels globally."

57.    Avendra caused damage to Maxim World by sharing misleading and confidential information about Maxim World's financial practices; looping the Hospitality Chain into disputes about amounts Avendra claimed Maxim World owed; and repeatedly including the Hospitality

Chain in communications critiquing Maxim World's performance, including communications in which Avendra subjected Maxim World to a detailed SIP.

58.    As a result of Avendra's misconduct, Maxim World estimates it has suffered tens of millions of dollars in lost profits.

## CAUSES OF ACTION

### COUNT I

### Fraudulent Inducement

59.    Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

60.    In or around February 2018, Avendra offered Maxim World status as a "Preferred Supplier."

61.    Avendra offered the "Avendra Supplier Agreement," proposing that, in exchange for Maxim World's Allowances, it would drive new customers to Maxim World.

62.    Avendra entered into the Agreement with an undisclosed intent never to fulfill its obligations.

63.    Avendra's external representations to the public, which included Maxim World, and to Maxim World directly, left Maxim World with the impression that it intended to fulfill such obligations.

64.    Avendra knew that its representations over the course of the parties' "Preferred Supplier" relationship gave Maxim World the impression that Avendra contemplated fulfilling its obligations. Nevertheless, Avendra failed to inform Maxim World that it had not performed and did not intend to perform these obligations until July 2025.

65.    By representing that it would fulfill these obligations, Avendra intended to induce Maxim World to pay Allowances.

66.    Maxim World not only had the right to rely on Avendra's representations concerning its advertised services, but was also compelled to rely on Avendra's representations given Avendra's superior knowledge and expertise concerning its own offerings.

67.    As a group purchasing organization, Avendra possessed specialized knowledge about its institutional capabilities that was unavailable to Maxim World as a supplier-customer.

68.    Avendra held itself out as a purveyor of sales opportunities for Preferred Suppliers and promised Maxim World access to such opportunities.

69.    Given this asymmetry of information and expertise, Maxim World reasonably and necessarily relied on Avendra's representations concerning its capabilities and intended service offerings.

70.    Only later, when confronted by Maxim World, did Avendra admit that it had no intent to connect Maxim World with hospitality providers—despite understanding the importance of this service to Maxim World. Had Avendra disclosed the services it actually intended to offer, Maxim World would have understood that the Preferred Supplier program guaranteed nothing more than listing Maxim World on various Avendra-sponsored websites and publications.

71.    As a direct and proximate result of its reliance on Avendra's false and misleading representations and omissions, Maxim World has been damaged and will continue to be damaged from Allowance payments made since March 2018.

15

72.    Maxim World has suffered damages in excess of $1.5 million exclusive of interest, attorneys' fees and costs, from payments made as a direct result of Avendra's fraudulent inducement.

73.    Maxim World has also lost business opportunities due to years of reliance on Avendra's falsely advertised services.

## COUNT II

### Negligent Misrepresentation

74.    Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

75.    To the extent Avendra's conduct in Count I does not constitute fraud, such conduct was negligent.

76.    Avendra failed to exercise reasonable care when it received inquiries from Maxim World regarding inclusion in purchase orders and sales opportunities after February 2018 because Avendra knew that Maxim World believed Avendra to be facilitating such services but failed to correct Maxim World's misconception.

77.    In agreeing to continuously pay Allowances, Maxim World reasonably relied on Avendra's Supplier Agreement guarantees to provide purchasing services.

78.    As a direct and proximate result of its reliance on Avendra's false and misleading representations, Maxim World has been damaged and will continue to be damaged from costs incurred associated with all subscription and rebate dues, including Allowance payments, made since March 2018.

79.    Maxim World has also lost business opportunities due to years of reliance on Avendra's falsely advertised services.

## COUNT III

### Breach of Contract

80.    Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

81.    The Agreement is valid and enforceable.

82.    Maxim World performed and remained willing to perform all of its obligations under the Agreement at all times relevant.

83.    Avendra breached the Agreement by, among other things, violating:

a.    Section 1(b) by not causing its clients to purchase any goods or services from Maxim World;

b.    Section 1(c) by not making every reasonable effort to provide Maxim World with information relating to Avendra's clients; and

c.    Section 16(a) by sharing "Confidential Information," defined in the Agreement as "non-public information of either party," with third parties, including the Hospitality Chain.

d.    Moreover, Avendra breached Sections 1(b), 1(c), and the implied covenant of good faith and fair dealing by disparaging Maxim World to third parties, including Avendra's clients, and thereby damaging Maxim World's business relationships, discouraging Avendra's clients from purchasing Maxim World's products, and willfully destroying the value of the Agreement.

84.    Maxim World's damages flow directly from and are the natural and probable consequences of Avendra's breach.

85.     Maxim World is entitled to damages as a result of Avendra's breach, as well as attorneys' fees and costs incurred in resolving this dispute.

**COUNT IV**

**Tortious Interference with Prospective Contractual Relations**

86.     Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

87.     Maxim World had a business relationship with the Hospitality Chain, as discussed above.

88.     Avendra knew of Maxim World's relationship with the Hospitality Chain and, possessing that knowledge, attempted to persuade the Hospitality Chain not to do business with Maxim World.

89.     Avendra used dishonest, unfair, and improper means of interference, including falsely disparaging Maxim World, misrepresenting that Maxim World owed Avendra overdue payments, and sharing Maxim World's confidential information.

90.     Upon information and belief, Avendra used these means of interference to tortiously enrich itself, unjustly, by attempting to divert the Hospitality Chain's business from Maxim World to itself.

91.     Avendra's interference caused damage to Maxim World's relationship with the Hospitality Chain, ultimately precipitating a dissolution of the business relationship.

## COUNT V

### Federal Unfair Competition

### 15 U.S.C. § 1125(a)(1) (Lanham Act Section 43(a))

92.     Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

93.     Avendra offers its Preferred Supplier program in interstate commerce.

94.     As detailed herein, Avendra misrepresented and continues to misrepresent the offerings of its Preferred Supplier program, as well as its capabilities in order to effectuate the Preferred Supplier Program.

95.     Avendra's ability to drive new business to companies that signed on to become Preferred Suppliers is material to supplier-customers who purchase Avendra's services.

96.     The basis on which supplier-customers contract with Avendra is material to hospitality providers who consider doing business with Avendra, as well as other suppliers who consider becoming Preferred Suppliers.

97.     Avendra's statements referenced herein regarding its capabilities with respect to the Preferred Supplier program, as well as the offerings of the Preferred Supplier program, are literally false, deceived and continue to deceive consumers of Avendra's services, and otherwise have the tendency to deceive potential purchasers.

98.     Avendra's deceptive conduct was knowing, willful and intentional, and undertaken with the knowledge that the conduct would or was highly likely to result in harm to Maxim World.

99.     Maxim World has suffered direct injury as a result of Avendra's deception of customers and hospitality providers in that the deception led Maxim World to participate in its

Preferred Supplier program for several years, causing Maxim World to pay Allowances without benefit, and causing Maxim World to lose opportunities to expand into new markets.

100.    Accordingly, Maxim World is entitled to judgment awarding it damages, attorneys' fees, costs and any other relief the court deems just.

## COUNT VI

### Common Law Unfair Competition

101.    Maxim World re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

102.    As detailed herein, Avendra misrepresented and continues to misrepresent the offerings of its Preferred Supplier program as well as its capabilities in order to effectuate the Preferred Supplier Program.

103.    Avendra's ability to drive new business to companies that signed on to become Preferred Suppliers is material to supplier-customers who purchase Avendra's services.

104.    The basis on which supplier-customers contract with Avendra is material to hospitality providers who consider doing business with Avendra, as well as other suppliers who consider becoming Preferred Suppliers.

105.    Avendra's statements referenced herein regarding its capabilities with respect to the Preferred Supplier program, as well as the offerings of the Preferred Supplier program, are literally false, deceived and continue to deceive consumers of Avendra's services, and otherwise have the tendency to deceive potential purchasers.

106.    Avendra's deceptive conduct was knowing, willful and intentional, and undertaken with the knowledge that the conduct would or was highly likely to result in harm to Maxim World.

20

107.    Maxim World has suffered direct injury as a result of Avendra's deception of customers and hospitality providers in that the deception led Maxim World to participate in its Preferred Supplier program for several years, causing Maxim World to pay Allowances without benefit, and causing Maxim World to lose opportunities to expand into new markets.

108.    Accordingly, Maxim World is entitled to judgment awarding it damages, attorneys' fees, costs and any other relief the court deems just.

### **PRAYER FOR RELIEF**

WHEREFORE, Maxim World prays this Court for the following relief:

a.   Monetary damages in an amount to be proven at trial but which in any event exceed $50 million;

b.   Pre-judgment and post-judgment interest at the maximum rates permitted by law;

c.   Reasonable costs, expenses, and attorneys' fees;

d.   Punitive damages; and

e.   Such other or further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
         June 9, 2026

Respectfully submitted,

/s/ L. Reid Skibell

L. Reid Skibell
Peter W. Kaplan
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
(212) 970-1600
rskibell@glennagre.com
pkaplan@glennagre.com

*Attorneys for Plaintiff*